133 P.3d 767

**OFFICE OF HAWAIIAN AFFAIRS, Trustees of the Office of Hawaiian Affairs, Plaintiffs–Appellants/Cross–Appellees,**

v.

**STATE of Hawai'i, Defendant–Appellee/Cross–Appellant.**

No. 26615.

Supreme Court of Hawai'i.

April 28, 2006.

Robert G. Klein (Nadine Y. Ando and Christopher J. Cole, with him on the briefs, of McCorriston Miller Mukai MacKinnon), Honolulu, and William Meheula and David F. Fasi, with him on the briefs, of Winer Meheula & Devens, Honolulu, for plaintiffs-appellants/cross-appellees.

Dorothy Sellers (Charleen M. Aina, Girard D. Lau, and William J. Wynhoff, with her on the brief, Deputy Attorneys General), Honolulu, for defendant-appellee/cross-appellant.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ., and Circuit Judge HARA, in place of DUFFY, J., recused.

Opinion of the Court by MOON, C.J.[1]

Plaintiffs-appellants the Office of Hawaiian Affairs (OHA) and the Board of Trustees of OHA (the trustees) [hereinafter, collectively, the plaintiffs] appeal from the Circuit Court of the First Circuit's[2] May 19, 2004 final judgment in favor of defendant-appellee State of Hawai'i (the State). On appeal, the plaintiffs contend that the circuit court erred in: (1) granting the State's motion to dismiss their first amended complaint [hereinafter,

motion to dismiss]; (2) denying the plaintiffs' motion for leave to amend the first amended complaint [hereinafter, motion to amend]; and (3) denying the plaintiffs' motion to bifurcate the justiciable and nonjusticiable issues presented in this case [hereinafter, motion to bifurcate]. For the following reasons, we affirm the circuit court's final judgment.

## I. BACKGROUND

Due to the procedural posture of this case, the material facts presented by the plaintiffs are accepted as true and are relatively brief. The underlying contextual background, however, is complex, arising out of nearly three decades of effort to resolve longstanding issues regarding the State's trust obligations to native Hawaiians. Much of this historical background was detailed in *Trustees of Office of Hawaiian Affairs v. Yamasaki* (*Yamasaki*), 69 Haw. 154, 158–65, 737 P.2d 446, 449–53, *cert. denied*, 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987), and *Office of Hawaiian Affairs v. State* (*OHA I*), 96 Hawai'i 388, 390, 31 P.3d 901, 903 (2001). As the instant case is substantially related to and intertwined with *Yamasaki* and *OHA I*, we trace the prior history and decisions of this court, as well as provide additional background of the federal legislative scheme regarding airport grants and revenues to properly address the issues raised herein.

### A. The Creation of OHA[3]

As this court detailed in *Yamasaki* and *OHA I*, the State holds ceded lands[4] in a public land trust for five purposes, one of which is "for the betterment of the conditions of native Hawaiians[.]" *OHA I*, 96 Hawai'i at 390, 31 P.3d at 903 (citing Admission Act § 5(f)) (emphasis omitted). In 1978, the people of Hawai'i clarified the State's

1. Pursuant to this court's grant of plaintiffs-appellants' motion for reconsideration on December 23, 2005, the previous opinion of the court in this case, filed on September 9, 2005, is vacated.

2. The Honorable Gary W.B. Chang presided over the instant case.

3. A more detailed factual account of the historical circumstances leading up to the creation of OHA and the public land trust discussed herein may be found in *OHA I*, 96 Hawai'i at 390, 31

P.3d 903, and in *Yamasaki*, 69 Haw. at 158–65, 737 P.2d at 449–53.

4. The lands "ceded" by the Republic of Hawai'i to the United States at annexation are referred to in section 5(b) of the Admission Act of March 18, 1959, Pub.L. No. 86–3 § 5, 73 Stat. 4 [hereinafter, Admission Act]. *See OHA I*, 96 Hawai'i at 390, 31 P.3d at 903 (citing Admission Act § 5(b)); *see also* Pub.L. No. 103–150, 1993 S.J. Res. 19.

trust obligation to native Hawaiians during a Constitutional Convention, as set forth in various provisions of the Hawai'i Constitution, including article XII, sections 4 through 6, *see infra* note 15, wherein OHA was created and charged with managing proceeds derived from the ceded lands and designated for the benefit of native Hawaiians. *Id.* Additionally, article XVI, section 7 of the Hawai'i Constitution requires the State to enact legislation regarding its trust obligations. *Id.* (citing Haw. Const. art. XVI, § 7). Thus, in 1979, legislation was enacted that set forth the purposes of OHA and described the powers and duties of the trustees. *Id.* at 391, 31 P.3d at 904 (citing 1979 Haw. Sess. L. Act 196, § 2 at 398–99, § 8 at 406 (codified at HRS chapter 10)). In 1980, the legislature amended HRS chapter 10 by adding HRS § 10–13.5, which provided that "[t]wenty per cent of all *funds* derived from the public land trust ... shall be expended by [OHA] for the purposes of this chapter." *Id.* (citing 1980 Haw. Sess. L. Act 273, § 1 at 525) (emphasis added) (brackets and ellipsis in original). However, "[b]etween 1980 and 1983, OHA became increasingly dissatisfied with the State's lack of progress in fulfilling its obligations." *Id.*

## B. *Yamasaki*

In 1983, the trustees, due to their dissatisfaction, initiated the action in *Yamasaki* against the State based on the State's alleged failure to fulfill its obligation to allocate "twenty per cent of all funds derived from the public land trust to OHA as required by HRS § 10–13.5 [(1985)]." 69 Haw. at 165, 737 P.2d at 453. The dispute centered on a claim against the attorney general, the Chairman of the Board of Land and Natural Resources (BLNR), and the Director of Finance regarding illegal sand-mining on ceded land at Papohaku Beach that resulted in royalty payments to a private party and land conveyed to the State in lieu of damages. *Id.* at 166, 737 P.2d at 453. On interlocutory appeal,

this court held that it was unable to determine the parameters of HRS § 10–13.5 "because the seemingly clear language of HRS § 10–13.5 actually provides no judicially discoverable and manageable standards for resolving the disputes and they cannot be decided without initial policy determinations of a kind clearly for nonjudicial discretion." *Id.* at 173, 737 P.2d at 457 (citation, brackets, and internal quotation marks omitted). Stated differently, this court "concluded that the construction of the term 'funds' [as used in HRS § 10–13.5] ... constituted a non-justiciable political question because the legislature had not provided judicially manageable standards." *OHA I*, 96 Hawai'i at 393 n. 6, 31 P.3d at 906 n. 6 (citing *Yamasaki*, 69 Haw. at 172–73, 737 P.2d at 457). This court held that, due to the nonjusticiable nature of the issues, no ruling could be made as to whether OHA was entitled to damages for the illegal mining of sand or that a pro rata portion of the land conveyed to the State should be turned over to OHA. *Yamasaki*, 69 Haw. at 174–74, 737 P.2d at 458.

## C. *Post–Yamasaki Legislation*

In response to this court's decision in *Yamasaki*, the legislature enacted Act 304 as "the first step in the resolution of a series of complex questions about what constitutes the extent of the trust holdings and the trust obligations of the State to the native Hawaiians." Hse. Stand. Comm. Rep. No. 306–90, in 1990 House Journal, at 960; *see also* Sen. Stand. Comm. Rep. No. 2778, in 1990 Senate Journal, at 1150–51. Act 304, *inter alia*, amended HRS § 10–13.5 to provide "a clear definition of 'public land trust' and 'revenues,' " in order to "resolve the issue for the future." *Id.* In doing so, the legislature believed that the measure would "enable the State to fulfill its trust obligations to the Hawaiians and w[ould] signal a new era for the native Hawaiian community." *Id.* Specifically, Act 304 provided that: "Twenty per cent of all *revenue* [5] derived from the public

---

**5.** The legislature defined "revenue" in section 3 of Act 304 to include all

 proceeds, fees, charges, rents, or other income derived from any activity that is situated upon and results from the actual use of the public land trust, but excluding any income, pro-

ceeds, fees, charges, or other moneys derived through the exercise of sovereign functions and powers including 11 enumerated descriptions of sources of revenue that are excluded from the term "revenue" under the statute.

land trust shall be expended by [OHA] for the betterment of the conditions of native Hawaiians." *OHA I*, 96 Hawai'i at 391–92, 31 P.3d at 904–05 (citing 1990 Haw. Sess. L. Act 304, § 7 at 951 and HRS § 10–13.5 (1993)) (emphasis and some brackets in original). Additionally, section 8 of Act 304 provided a mechanism whereby the State and OHA were to determine the amounts owed to OHA for the period of June 16, 1980 through June 30, 1991. *Id.* at 392, 31 P.3d at 905 (citing 1990 Haw. Sess. L. Act 304, § 8 at 951). Thus, pursuant to section 8, the legislature appropriated funds for the payment of approximately $130 million to OHA on April 16, 1993. *Id.* (citing 1993 Haw. Sess. L. Act 35, at 41). However, the $130 million appropriation "[did] not include several matters regarding revenue which OHA [had] asserted [was] due OHA and which [the State had] not accepted and agreed to." *Id.* (quotation marks omitted).

### D. *OHA I*

#### 1. Circuit Court Proceedings

Based on the State's refusal to appropriate funds for "several matters regarding revenue which OHA [had] asserted [was] due," OHA initiated the action in *OHA I* on January 14, 1994, alleging that the State had failed to pay OHA its full share of "revenues" that the State had collected from ceded lands since June 16, 1980. *Id.* OHA sought an accounting, restitution or damages, prejudgment interest, attorneys' fees and costs, and such other relief as the court deemed just and proper. *Id.*

The State moved to dismiss the case on the following grounds: (1) lack of justiciability; (2) sovereign immunity; (3) statute of limitations; and (4) waiver/estoppel. *Id.* The circuit court orally denied the State's motion to dismiss and ruled that OHA was entitled to revenues from each of the eleven enumerated sources. *Id.* Thereafter, the State filed its notice of appeal on November 22, 1996. *Id.*

*OHA I*, 96 Hawai'i at 392, 31 P.3d at 905 (citing 1990 Haw. Sess. L. Act 304, § 3 at 948 and HRS

#### 2. Federal Legislation Enacted While *OHA I* Was Pending Appeal

During the pendency of the appeal in *OHA I*, an issue arose between the Federal Aviation Administration (FAA) and the State of Hawai'i regarding the State's use of airport revenues to fulfill its obligations as trustee of the ceded lands. The FAA viewed such use of airport revenues as contrary to the policies and conditions of grants provided under the Airport Improvement Program (AIP) created under the Airport and Airway Improvement Act of 1982, Pub.L. No. 97–248, § 511(a)(12), 96 Stat. 676, (1982) (codified, as subsequently amended, at 49 U.S.C. § 47107(b)(1)), which requires airport revenues to be spent for airport purposes only in order to promote the self-sufficiency of airports. Under the AIP,

[a]s originally enacted in 1982, the revenue retention assurance [under 49 U.S.C. § 47107(b)] required airport owners to use "all revenue generated by the airport for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the owner or operator of the airport and directly related to the actual transportation of passengers or property." The plain purpose of section [49 U.S.C. § 47107(b)] was to prevent an airport owner or operator who receives Federal assistance from using airport revenues for expenditures unrelated to the airport.

Policies and Procedures Concerning the Use of Airport Revenues, 61 Fed.Reg. 7134 (Feb. 26, 1996) (ellipses omitted). The rationale for the revenue retention requirement

is that the Federal AIP Program can underwrite only about 20% to 30% of the total capital development needed by airports. To ensure the maximum effectiveness of the AIP program, airports should also spend all of the money they generate to operate and develop the airport. A federal grant should not furnish an opportunity for an airport to use federal funds to replace other airport generated funds, and then use the latter for general governmental purposes, resulting in no net capital

§ 10–2) (ellipses and brackets omitted).

improvements for the federal grant dollars expended.

*Id.* (citing H.R.Rep. No. 103–240, 103d Cong., 1st Sess. 14 (1993)).

In 1995, the United States Department of Transportation (USDOT) conducted an audit of the State's administration of its AIP grants after a request by the Regional Audit Manager (RAM) for an opinion as to whether the Hawai'i Department of Transportation (HDOT) was required by State statute to pay airport revenues to OHA considering the federal AIP grant conditions. *OHA I,* 96 Hawai'i at 396, 31 P.3d at 909. The grant conditions in 49 U.S.C. § 47107(b)(1) directed that

> revenues generated by a public airport . . . be expended for the capital or operating costs of—
>
> (A) the airport;
>
> (B) the local airport system; or
>
> (C) other local facilities which are owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property."

49 U.S.C. § 47107(b)(1). Congress further specified that the "use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems" was prohibited under the Authorization Act of 1994. 49 U.S.C. § 47107(*l*)(2)(B) (quotation marks omitted).

In a 1996 report, the USDOT Inspector General [hereinafter, the IG Report] concluded that the State's payments to OHA between 1992 and 1995 in the amount of $28.2 million "were a diversion of airport revenue in violation of [the FAA Authorization Act of 1994]" because OHA provided no services for the $28.2 million. *OHA I,* 96 Hawai'i at 396, 31 P.3d at 909 (citing FAA Report No. R9–FA–6–05, Airport Improvement Program Grants Provided to the Hawai'i Department of Transportation, at 11 (Sept. 19, 1996)). The IG Report recommended that the FAA "withhold payments on current grants and approval of further grants if the State does not recover the $28.2 million in airport revenues paid to OHA for nonairport purposes." *Id.* (citation, brackets, colon, and internal

quotation marks omitted). In response to the IG report, the State attorney general opined that "we view the subject payment of $28.2 million in airport special fund moneys to OHA pursuant to Act 304 as an operating cost of the State's airports within the meaning of 49 U.S.C. § 47107(b)(1)." In addition, then-Governor Benjamin Cayetano addressed the members of the State Senate, noting that:

> It is a serious enough matter that the use of the airport revenue fund to make the OHA payments may violate federal law and grant assurances. However, language found in section 16 of Act 304, Session Laws of Hawai'i 1990 [(quoted *infra* note 7)], appears to compound drastically the problem. That language may, by operation of law, repeal [*inter alia,* HRS § 10–13.5], and turn them back into the ineffective and confusing state they were in when the Supreme Court decided [*Yamasaki.*]
>
> . . . .
>
> To be sure, the Inspector General's findings probably will not be a final determination on this matter. For one thing, we expect that the State will be afforded an opportunity to defend its use of airport funds. Nevertheless, I consider the situation serious at this time to share with you my concerns about the use of airport funds to make payments to OHA and to alert you to the cloud that section 16 of Act 304 appears to place over chapter 10, HRS.

In early 1997, the State began to deposit airport-related payments owed to OHA in an escrow account pending resolution of the IG Report. On April 25, 1997, the FAA issued a memorandum [hereinafter, the FAA Memorandum], stating its concurrence with the IG Report's conclusion and recommendation.

On July 22, 1997, U.S. Senate Report 105–55 regarding the "Department of Transportation and Related Agencies Appropriations Bill" stated:

> Federal aviation law . . . prohibits the diversion of airport revenues for non-airport purposes. Recently, the Department of Transportation Inspector General identified $30,000,000 in past payments to the [OHA] as illegal diversions of airport revenues. The FAA agreed with the [IG Re-

port]. However, it is unclear whether a Federal court would agree with the [Inspector General] and the FAA[,] should their determination be challenged. Given the fact that the State of Hawaii owns the lands in trust for the betterment of native Hawaiians, it is conceivable that a reviewing court could find that the payments of airport revenues were in the nature of rent, which is [a] permissible use of airport revenue.

*To put the issue to rest, the general provision provides that the State of Hawaii is forgiven any obligation to repay past amounts diverted for trust purposes, in return for a clear congressional statement prohibiting any future diversions.*

(Emphasis added.) On August 19, 1997, the State attorney general authored a newspaper article, in which she stated that the State would not challenge the FAA's position that the use of airport revenues to pay OHA was improper.

On June 30, 1997, the Hawai'i Legislature enacted Act 329, relating to the public land trust, in response to the continued controversy regarding the proper definition of "revenue" under HRS § 10–13.5.1997 Haw. Sess. L. Act 329, § 1 at 956. Because of the concerns about the effect of the circuit court's ruling and recognizing the potential invalidity of section 16 of Act 304, *see infra* note 7, a new section was added to HRS chapter 10 via Act 329, which provided:

Notwithstanding the definition of revenue contained in this chapter and the provisions of section 10–13.5, and notwithstanding any claimed invalidity of Act 304, Session Laws of Hawai'i 1990, the income and proceeds from the pro rata portion of the public land trust under article XII, section 6 of the state constitution for expenditure by the office of Hawaiian affairs for the betterment of the conditions of native Hawaiians for each of fiscal year 1997–1998 and fiscal year 1998–1999 shall be $15,100,000.

HRS § 10–13.3 (Supp.2005); *see also* 1997 Haw. Sess. L. Act 329, § 2 at 958. These interim monies were intended to "ensure that adequate income and proceeds from a pro rata portion of the public trust continue to be available to [OHA] . . . while the contemplated process to address issues relating to the public trust is underway." 1997 Haw. Sess. L. Act 329, § 1 at 958.

In 1998, Congress enacted the "Department of Transportation and Related Agencies Appropriations Act," Pub.L. No. 105–66, § 340, 111 Stat. 1425 (1998) [hereinafter, the Forgiveness Act], which states in pertinent part:

(7) [C]ontrary to the prohibition against diverted airport revenues from airport purposes under Section 47107 of title 49, United States Code, *certain payments from airport revenues may have been made for the betterment of Native Hawaiians,* or Alaskan natives *based upon the claims related to lands ceded to the United States* [.]

. . . .

(b) TERMINATION OF REPAYMENT RESPONSIBILITY.—Notwithstanding the provisions of 47107 of title 49, United States Code, or any other provision of law, *monies paid for claims related to ceded lands and diverted from airport revenues and received prior to April 1, 1996,* by any entity for the betterment of Native Americans, Native Hawaiians, or Alaska Natives, *shall not be subject to repayment.*

(c) PROHIBITION ON FURTHER DIVERSION.—*There shall be no further payment of airport revenues for claims related to ceded lands,* [6] whether characterized as operating expenses, rent, or otherwise, and whether related to claims for periods of time prior to or after the date of the enactment of this Act.

(d) CLARIFICATION[.]—*Nothing in this Act shall be construed to affect* any existing Federal statutes, enactments, or trust obligations created thereunder, or any statute of the several States that define *the*

---

6. We note that Congress characterized the payments to OHA as based on "claims" related to lands ceded to the United States. However, as the attorney general and Congress recognized in the Senate Report 105–55, the State views airport revenue payments as fulfilling its obligations under the public land trust.

*obligations of such States to Native Americans, Native Hawaiians or Alaska natives in connection with ceded lands, except to make clear that airport revenues may not be used to satisfy such obligations.*

*OHA I*, 96 Hawai'i at 396–97, 31 P.3d at 909 (citing the Forgiveness Act § 340) (emphases, brackets, and ellipses in original).

The following year, in 1999, the legislature submitted Senate Bill No. 1635 for approval by Governor Cayetano. Senate Bill No. 1635 carried the same purpose of facilitating resolution of public land trust issues as Act 329, which had provided interim payments to OHA only through fiscal year 1998–1999. The bill provided a $16,060,000 appropriation for fiscal year 1999–2000. However, the OHA trustees requested that Governor Cayetano veto the bill, preferring to leave the matters in controversy for this court to decide in *OHA I*. Governor's Message, "Statement of Objections to Senate Bill No. 1635," in 1999 Senate Journal, at 803. During the time between the sunset of Act 329 (at the end of fiscal year 1998–99) and the resolution of *OHA I* (in September 2001), the disposition of OHA's pro rata portion of ceded lands revenues under Act 304 resumed, except for the airport revenue payments prohibited by the Forgiveness Act. During the interim period, the legislature made no appropriations to OHA for the airport system's use.

### 3. This Court's Decision in *OHA I*

This court in *OHA I* acknowledged that "Congress *does not* have the power to instruct this state on how to expend its own funds," although "Congress *does* have the authority to *condition the use of federal funds.*" 96 Hawai'i at 397, 31 P.3d at 910 (emphases added). Assuming that the Forgiveness Act represented a valid condition on

the receipt of federal airport funds, this court held that "Act 304, as applied to the airport revenue sought in this case, conflicts with the provisions of the Forgiveness Act. As such, by its own terms, Act 304 is invalid." [7] *Id.* at 399, 31 P.3d at 912. This court went on to hold that, inasmuch as "the invalidity of Act 304 reinstates the immediately preceding version of HRS § ... 10–13.5, which then places this court precisely where it was at the time *Yamasaki* was decided[,]" *id.* at 400, 31 P.3d at 913, "this court is again left with no judicially manageable standards by which to discern what specific funds OHA is entitled to receive under chapter 10, without making 'an initial policy determination ... of a kind normally reserved for nonjudicial discretion.' " [8] *Id.* at 401, 31 P.3d at 914 (citation omitted) (ellipsis in original). Accordingly, this court "dismiss[ed the] case for lack of justiciability." *Id.* at 401, 31 P.3d at 914.

### E. *The Instant Case*

#### 1. The Plaintiffs' First Amended Complaint and the State's Motion to Dismiss

The plaintiffs filed a complaint against the State on July 21, 2003. On August 26, 2003, they filed a first amended complaint [hereinafter, first amended complaint or complaint]. Therein, the plaintiffs alleged that "the Forgiveness Act would not have become law if the State had properly challenged the FAA Memorandum and thus there would not have been a federal law in conflict with Act 304[.]" The plaintiffs asserted that the State breached its trust duties by refusing to challenge the FAA Memorandum and that such breach was a "substantial factor[ ] that resulted in the passing of the Forgiveness Act and the Hawai'i Supreme Court's opinion rendered in [*OHA I*,]" which invalidated Act 304. As a

---

7. Specifically, this court invalidated Act 304 pursuant to section 16 of the Act, which stated:

> The provisions of this Act shall be enforced to the extent they are *not held to conflict with any federal or state law, rules, or regulations.* The provisions of this Act are not severable and if any provision of the Act, or the application thereof to any person or circumstance is held to conflict with any federal or state law, rules, or regulations, *this Act, in its entirety, shall be invalid* and sections 10–2, 10–3, 10–5, 10–13

and 10–13.5, Hawaii Revised Statutes, shall be reenacted in the form in which they read on the day before the approval of this Act.

1990 Haw. Sess. L. Act 304, § 16 at 953 (emphases added).

8. Additionally, this court held that the State was not obligated "to pay amounts 'equivalent to' the airport revenue due to OHA from other sources, such as the general fund." *OHA I*, 96 Hawai'i at 398, 31 P.3d at 911.

result of Act 304's invalidation, the plaintiffs could no longer recover airport-related revenues from the State. Additionally, because the plaintiffs believe that Act 304 constituted a contract and settlement agreement between the State and OHA, they alleged that the State "breached the Act 304 settlement" and "violated the Contract Clause of the United States Constitution"[9] by allowing the Forgiveness Act to invalidate Act 304. The first amended complaint set forth plaintiffs' claims and prayer for relief as follows:

34. *The State breached fiduciary duties as trustee of the native Hawaiian public trust, breached the Act 304 settlement, violated H.R.S. Chapter 10, violated Article XII, Sections 4–6 of the Constitution of the State of Hawaii, violated the Contract Clause of the United States Constitution, Article I, Section 10, clause 1, and is liable for misrepresentation and non-disclosure* by the acts and omissions set forth above including but not limited to: (1) failing to challenge the positions set forth in the FAA Memorandum; (2) resolving its dispute with the FAA by obtaining a forgiveness of the prior $30 million payment in exchange for a promise not to make future airport revenue payments to OHA and not to appeal the positions set forth in the FAA Memorandum; (3) breaching the trust duty of impartiality by not challenging the positions set forth in the FAA Memorandum in order to use them as a sword in [*OHA I*] and subsequent appeal; (4) failing to timely advise OHA that the State was not going to continue to challenge the positions set forth in the FAA Memorandum or IG Report, and that it was planning to settle with the federal government, in order to provide OHA with a fair opportunity to take measures to step into the State's position to oppose the FAA; and, (5) failing to obtain instructions from the Court on how to proceed given its conflict position of defending the State against OHA in *OHA I* and having a duty to challenge the positions set forth in the FAA Memorandum.

35. The State's breaches, errors and omissions as set forth above were substan-tial factors that resulted in the passing of the Forgiveness Act and the Hawaii Supreme Court's opinion rendered in [*OHA I* ]. Accordingly, the State is liable to OHA for an accounting, restitution and/or damages including but not limited to: (1) relief alleged by OHA in [*OHA I* ]; and, (2) amounts payable under Act 304 that have not been paid, including but not limited to, airport landing fees.

36. OHA is entitled to a declaratory judgment that: (1) orders the State to reinstate Act 304 on the grounds that the Forgiveness Act would not have become law if the State had properly challenged the FAA Memorandum and thus there would not have been a federal law in conflict with Act 304; (2) orders the State to pay airport-related income, proceeds, funds and/or revenues to OHA from sources other than airport revenues; (3) appoints an independent trustee to temporarily replace the State as trustee of the native Hawaiian public trust with respect to matters relating to reinstatement of Act 304 and the payment of airport-related revenues to OHA from sources other than airport revenues; and (4) determines whether disputed items should be included as income, proceeds, funds and/or revenues owed to OHA.

37. OHA is also entitled to injunctive relief that bars the State and its agents, employees and officials from opposing steps to reinstate Act 304 and to pay airport-related income, proceeds, funds and/or revenues to OHA from sources other than airport revenues.

WHEREFORE, Plaintiffs pray for judgment against the State for: (1) accounting, restitution and/or damages; (2) declaratory relief set forth above; (3) injunctive relief set forth above; (4) attorneys' fees and costs; pre-judgment and post-judgment interest; and (5) such other relief as deemed fair and equitable to the [c]ourt.

(Emphasis added.) In sum, the plaintiffs asserted claims for (1) breach of fiduciary duties as trustee, flowing from violations of

---

9. The Contract Clause of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts[.]" U.S. Const., art. I, § 10, cl. 1.

HRS chapter 10, the Admission Act, and the Hawai'i State Constitution, (2) breach of the Act 304 settlement agreement, (3) violation of the Contract Clause, and (4) misrepresentation and non-disclosure. The plaintiffs requested relief in the form of (1) accounting, restitution, and/or damages, (2) declaratory relief, (3) injunctive relief, (4) attorneys' fees and costs, (5) pre- and postjudgment interest, and (6) such other relief deemed fair and equitable to the court.

In response to the plaintiffs' first amended complaint, the State filed a motion to dismiss the complaint on September 15, 2003. Therein, the State argued that the circuit court lacked subject matter jurisdiction over the case and that the complaint failed to state a claim upon which relief could be granted. Specifically, the State maintained that the plaintiffs' claims were barred by: (1) lack of justiciability; (2) sovereign immunity; (3) statute of limitations and various notice requirements; (4) res judicata; and (5) collateral attack.

On October 13, 2003, the plaintiffs filed a memorandum in opposition to the State's motion to dismiss. Therein, the plaintiffs alleged that the State waived its sovereign immunity in HRS § 661–1(1) (1993) [10] and HRS chapter 673, entitled "Native Hawaiian Trusts Judicial Relief Act." [11] The plaintiffs also argued that their claims were not barred by the statute of limitations because the instant action was timely filed and that the notice requirements alleged by the State

were not applicable in this case. Further, the plaintiffs contended that their claims were not barred by res judicata and did not seek to improperly collaterally attack *OHA I*. On October 17, 2003, the State filed its reply memorandum, in which it reiterated arguments advanced in the motion to dismiss.

On November 10 and 12, 2003, the circuit court held hearings on the State's motion to dismiss. At the hearings, the parties reasserted arguments raised in their pleadings. After indicating its inclination to grant the motion, the circuit court stated:

> this [c]ourt is still of the mind that there has been no legislation since *OHA I* was handed down, and in order for [the plaintiffs] to successfully prosecute any claim [they] may have against the State for breach of fiduciary duty, there has to be a measure of damages, and that's where the [c]ourt is struggling, is to find the measure of damages.
>
> I don't know how [the plaintiffs] can successfully prosecute [their] claim without relying on [Act 304], and so I still think we are in the realm of non-justiciability, because the fight over what revenues would have formed the basis for the percentage to be taken out and awarded to [the plaintiffs] still remains unclear[.]"

Nevertheless, at the close of the November 12, 2003 hearing, the circuit court "set a schedule for further briefing" because it

---

**10.** HRS § 661–1(1) provides in pertinent part:
**Jurisdiction.** The several circuit courts of the State ... shall, subject to appeal as provided by law, have original jurisdiction to hear and determine the following matters, and, unless otherwise provided by law, shall determine all questions of fact involved without the intervention of a jury.
(1) All claims against the State founded upon any statute of the State; or upon any regulation of an executive department; or upon any contract, expressed or implied, with the State, and all claims which may be referred to any such court by the legislature; provided that no action shall be maintained, nor shall any process issue against the State, based on any contract or any act of any state officer which the officer is not authorized to make or do by the laws of the State, nor upon any other cause of action than as herein set forth.

(Bold emphasis in original.)

**11.** HRS § 673–1 (1993) provides in pertinent part:
**Waiver of immunity.** (a) The State waives its immunity for any breach of trust or fiduciary duty resulting from the acts or omissions of its agents, officers and employees in the management and disposition of trust funds and resources of:
....
(2) The native Hawaiian public trust under Article XII, sections 4, 5, and 6 of the constitution of the State of Hawai'i implementing section 5(f) of the Admission Act;
and shall be liable in the same manner and to the same extent as a private individual under like circumstance, but shall not be liable for punitive damages.

(Bold emphasis in original.)

"needed to have further education on some of these issues[.]"

On November 17, 2003 and in response to the court's request for further briefing, the plaintiffs filed a supplemental memorandum in opposition to the State's motion to dismiss. In addition to arguments they previously asserted, the plaintiffs posited that, "even if the measurement of compensatory damages presents a political question, dismissal of the case is not warranted." Specifically, the plaintiffs argued that "[t]he measurement-of-damages-using-Act 304 [issue] does not 'inextricably' require dismissal here because it is clear that the liability issues are justiciable and the [c]ourt has the power to formulate whatever appropriate remedies should flow from a finding of wrongdoing[,]" such as: (1) "nominal damages"; (2) "an accounting"; and (3) "attorneys' fees." The plaintiffs further noted that, "regardless of whether the damages issue presents a political question, the [c]ourt can appropriately resolve the liability issue and leave the remedy for the legislature to enact." In other words, the plaintiffs maintained that the "liability issues can be bifurcated in order that litigation may proceed."

On November 21, 2003, the State filed a supplemental memorandum in support of its motion to dismiss. In addition to reiterating arguments it had previously made, the State, in response to the plaintiffs' suggestion of bifurcation, posited that such a "suggestion[ ] constitute[s] a roadmap for waste of judicial resources."

On November 25, 2003, the circuit court held another hearing on the State's motion to dismiss. After the parties presented oral argument, the court noted that the State's arguments regarding the statute of limitations, sovereign immunity, and res judicata did not warrant dismissal of the complaint. However, the circuit court ruled:

Turning finally to the question of justiciability and the political question. That's where this [c]ourt believes the crux of the fight is on this matter. *I think that there is no question that the Supreme Court in OHA I made a determination that the dispute should go back to the legislature for redefinition of what constitutes reve-nues under chapter 10, and without that guidance the [c]ourt could not address the question of damages or the judicially manageable standard by which OHA's share can be determined.*

. . . .

... [P]ermeating everything that has been asserted in connection with this—*the case at bar, it seems to always go back to the legislature can ultimately provide the remedy.*

Even if at the legislature the [sic] OHA is faced with the comment by the legislature that oh, you lost ... the case at bar, it still comes down to a legislative determination, and the [c]ourt simply could not get that out of its mind, notwithstanding the quality of briefing that OHA submitted.

So *the [c]ourt does conclude that we still have at the crux of the case at bar a political question, one that seeks to collaterally attack the ruling and the holding of OHA I. We are still left with judicially unmanageable standards or the lack of a judicially manageable standard for determining damages* [.]

... *So we still come back to the political arena as being the arena in which this debate should take place.* So for these and any other good causes shown in the record, *the [c]ourt will respectfully grant the motion to dismiss.*

(Emphases added.) The circuit court entered a written order dismissing the first amended complaint on December 26, 2003.

## 2. The Plaintiffs' Motion to Amend

After the State moved to dismiss the first amended complaint but prior to the court's dismissal of the complaint, the plaintiffs moved for leave to file a second amended complaint on October 1, 2003. The proposed second amended complaint [hereinafter, the original second amended complaint]: (1) added "a cause of action for breach of the covenant of good faith and fair dealing implied in the Act 304 Settlement because upon further reflection counsel for [the plaintiffs] believe[ ] that the State's failure to oppose the FAA's position not only constitutes a breach of the Act 304 Settlement as a contract but also the covenant of good faith and fair deal-

ing implied in the Act 304 Settlement"; (2) deleted the claims for misrepresentation and non-disclosure; (3) deleted "relief seeking to reinstate Act 304 because upon further reflection [the plaintiffs] believe[ ] that this can only be accomplished by the legislative branch"; and (4) clarified that, "although [the plaintiffs] alleged damages measured by the standards established under Act 304, the fact that [*OHA I*] effectively repealed Act 304 is not relevant because the State's alleged wrongs caused the effective repeal of Act 304."

On October 13, 2003, the State filed a memorandum in opposition to the plaintiffs' motion to amend, in which the State argued that "the proposed amendments are futile" and that the plaintiffs "knew or should have known of the proposed amendments when the initial complaint was filed." In response to the State's memorandum, the plaintiffs asserted that the proposed amendments were not futile.

After the circuit court orally dismissed the first amended complaint, the plaintiffs filed a supplemental motion in support of their motion to amend on November 28, 2003. The plaintiffs attached to the memorandum a revised second amended complaint [hereinafter, the revised second amended complaint]. In addition to changes proposed in the original second amended complaint, the revised second amended complaint requested the following declaratory relief:

> [The plaintiffs are] entitled to a declaratory judgment that declares that the State breached fiduciary duties as trustee of the native Hawaiian public trust, breached the Act 304 Settlement, breached the covenant of good faith and fair dealing implied in the Act 304 Settlement, violated H.R.S. Chapter 10 and/or violated Article XII, Sections 4–6 of the Constitution of the State of Hawaii, and that the State's breaches, errors and omissions as set forth above were substantial factors that resulted in the passing of the Forgiveness Act and the Hawaii Supreme Court's invalidation of Act 304 in [*OHA I*].

On December 1, 2003, the State responded to the plaintiffs' supplemental memorandum and alleged that:

> To the extent that OHA seeks to engraft a "new" claim for declaratory judgment onto the old claim for declaratory judgment, that request is futile. The law is that declaratory judgments may only issue in "cases of *actual controversy,*" and "where an *actual controversy* exists between contending parties."
>
> Because this court has already ruled that OHA's claims for monetary and injunctive relief are non-justiciable, a declaration that the State violated a fiduciary duty, breached a contract, etc., would be a purely *advisory opinion.* Because OHA will not receive monetary or injunctive relief as a result of any such declaration, it would have no judicial consequences for OHA.

(Emphases in original.) The State also asserted that, "[s]imply as a matter of procedure, there is no basis for [the plaintiffs'] filing."

On December 19, 2003, without holding a hearing on the matter, the circuit court entered an order denying the plaintiffs' motion to amend.

### 3. The Plaintiffs' Motion to Bifurcate

After the circuit court had dismissed the first amended complaint, but before denying their motion to amend, the plaintiffs filed a motion to bifurcate on November 28, 2003. They asserted that the "request for bifurcation is in part based on [their] request to amend [their] declaratory relief prayer" in the revised second amended complaint. Thus, the plaintiffs requested the circuit court to "rule on the [the motion to amend] before ruling on this motion because [the plaintiffs'] prayer for declaratory liability relief is an important part of this motion." Specifically, the plaintiffs asked the circuit court to "allow [them] to proceed with the liability issues in this case including the pursuit of the declaratory liability relief sought and any other relief that is not based on Act 304 as a measure of damages (*e.g.,* nominal damages, attorneys' fees and costs), inasmuch as these issues are clearly justicia-

ble." [12]

On December 1, 2003, the State filed its memorandum in opposition to the plaintiffs' motion to bifurcate. The State argued that:

> Bifurcation is improper because: (1) [the plaintiffs] ignore[ ] the "expedition and economy" requirements of the plain text of Hawaii Rule of Civil Procedure [(HRCP) Rule] 42(b) [(2003) [13]]; (2) [the plaintiffs'] position is illogical, and the requested bifurcation can serve no legal purpose; and (3) there is no case law supporting [the plaintiffs'] request for bifurcation.

The State additionally asserted:

> Even more fundamentally, [the plaintiffs'] request is not really a request for "bifurcation" at all. Bifurcation typically involves separating two claims or issues and then considering them sequentially. The purpose is to avoid unnecessarily litigating the second claim or issue if the first is resolved a certain way (*e.g.*, determining liability first, so that issues of damages need not be considered unless and until the first phase results in a finding of liability). In stark contrast, there indisputably will not be a second phase in this case because this court has already ruled that there are no judicially manageable standards to provide OHA a remedy. OHA does not actually seek "bifurcation," but, rather, seeks a *one-step-only* ruling on liability, with no judicial remedy step ever to follow.
>
> Rather than "bifurcate" so that resolving a dependent issue (*e.g.*, remedy) might be avoided once a preceding issue is determined (*e.g.*, a ruling denying liability), OHA asks for the exact opposite: it asks this court to reach an issue that it has already determined need not be reached because no remedy can issue even if liability were found. Thus, rather than bifurcating to preserve scarce judicial resources,

OHA asks for "bifurcation" to burden judicial resources for no practical purpose.

(Emphasis in original.)

After a hearing on the matter, the circuit court entered an order denying the plaintiffs request to bifurcate the justiciable and non-justiciable issues.

### 4. Judgment and Notice of Appeal

On May 19, 2004, the circuit court entered its final judgment in favor of the State and against the plaintiffs "as to all claims asserted against [the State] in plaintiffs' first amended complaint." The court also stated that "[t]here are no remaining claims" and that, in any case, "[a]ny remaining claims are dismissed without prejudice."

On June 8, 2004, the plaintiffs filed a timely notice of appeal.

## II. STANDARDS OF REVIEW

### A. Motion to Dismiss Complaint

A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable *de novo*. Moreover, we adopt the view of the Ninth Circuit Court of Appeals in *Love v. U.S.*, 871 F.2d 1488 (9th Cir.1989), *opinion amended on other grounds and superseded by Love v. United States*, 915 F.2d 1242 (9th Cir.1989):

> Our review [of a motion to dismiss for lack of subject matter jurisdiction] is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Id.* at 1491 (citations omitted).

*Norris v. Hawaiian Airlines, Inc.*, 74 Haw. 235, 239–40, 842 P.2d 634, 637 (1992) (brackets in original) (some citations omitted), *aff'd*,

---

12. We note that the plaintiffs' motion to bifurcate alternatively requested "leave to conduct limited preservation discovery during the indeterminate and potentially lengthy period of time that this case may be on appeal[,]" which the circuit court granted. However, this issue is not raised on appeal.

13. HRCP Rule 42(b) provides that courts "may order a separate trial of any claim ... or issues, always preserving inviolate the right of trial by jury as given by the Constitution or a statute of the State or the United States."

512 U.S. 246, 266, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994).

B. *Motion for Leave to Amend Complaint*

■■■ Orders denying motions for leave to amend a complaint are reviewed for an abuse of discretion. *See Hirasa v. Burtner,* 68 Haw. 22, 26, 702 P.2d 772, 776 (1985).

> The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*Ranger Ins. Co. v. Hinshaw,* 103 Hawai'i 26, 30, 79 P.3d 119, 123 (2003) (citation omitted).

## III. *DISCUSSION*

A. *Whether the Circuit Court Erred in Dismissing the Plaintiffs' First Amended Complaint*

■■ As previously indicated, the circuit court dismissed plaintiffs' first amended complaint, essentially because the plaintiffs' damages, as requested in their complaint, presented a political question that collaterally attacked *OHA I* inasmuch as the damages were sought pursuant to Act 304, which this court had previously invalidated in *OHA I.*

The plaintiffs' primary contention on appeal is that, contrary to the circuit court's conclusion that the requested damages were nonjusticiable, the complaint did request justiciable relief. The plaintiffs maintain that, in any case, the court was not limited to the relief pleaded in the complaint, but "had the obligation to formulate whatever appropriate remedies should flow from a finding of liabili-

ty, even if it is not the relief prayed for by [the plaintiffs]." Additionally, the plaintiffs argue that the claims in the complaint were justiciable inasmuch as determining whether the State breached its trust or contractual duties is "for the courts to decide."

In response, the State first argues that the complaint was properly dismissed inasmuch as the plaintiffs failed to state a claim upon which relief could be granted. Regarding the relief sought in the complaint, the State agrees with the circuit court and posits that, because the plaintiffs' relief relied upon the now-invalid Act 304, the complaint lacked justiciability.

In considering the State's motion to dismiss, the circuit court, as previously stated, did not believe dismissal was warranted based on the State's arguments regarding statute of limitations, sovereign immunity, and res judicata.[14] Rather, the circuit court's dismissal was based on its conclusion that the plaintiffs' requested damages were nonjusticiable and that the complaint sought to collaterally attack *OHA I.* The court did not determine whether the complaint stated a claim upon which relief could be granted. Accordingly, as a threshold matter, we must determine whether the plaintiffs' complaint stated a claim upon which any relief could be granted.

### 1. The Plaintiff's Claims

As previously indicated, the plaintiffs' complaint stated their claims as follows:

> The State breached its fiduciary duties as trustee of the native Hawaiian public trust, breached the Act 304 settlement, violated H.R.S. Chapter 10, violated Article XII, Section 4–6 of the Constitution of the State of Hawaii,[15] violated the Contract Clause

---

14. As more fully discussed *infra,* our affirmance of the circuit court's judgment in favor of the State is based on failure to state a claim, notice, and statute of limitation grounds. *See Gold v. Harrison* 88 Hawai'i 94, 103 n. 7, 962 P.2d 353, 362 n. 7 (1998) (stating that "[a]n appellate court may affirm a judgment of [the trial] court on any ground in the record that supports affirmance"). Thus, although the parties presented argument with respect to other grounds in support of their respective positions, our discussion is limited to the arguments raised that are related to disposi-

tive issues of failure to state a claim upon which relief can be granted and statute of limitations.

15. Briefly stated, article XII, section 4 provides that the ceded lands "shall be held by the State as a public trust for native Hawaiians and the general public." Haw. Const. art. XII, § 4. Article XII, section 5 establishes OHA and states that "[OHA] shall hold title to all the real and personal property now or hereafter set aside or conveyed to it which shall be held in trust for native Hawaiians and Hawaiians." Haw. Const. art. XII, § 5. Article XII, section 6 details the powers

of the United States Constitution, Article I, Section 10, clause 1, and is liable for misrepresentation and non-disclosure[.]

We note that the basis of each claim raised in the complaint is intertwined with the passage of the Forgiveness Act. Essentially, the plaintiffs allege that, had the State challenged the FAA Memorandum, Congress would *not* have passed the Forgiveness Act. The plaintiffs also allege that, had the State informed them of its decision not to challenge the memorandum, it would have afforded them the "fair opportunity to take measures to step into the State's position to oppose the FAA" and prevent the enactment of the Forgiveness Act. We address the parties' arguments and turn to whether each of the foregoing claims stated a claim upon which relief could be granted.

a. *the plaintiffs' claim for breach of settlement*

As previously indicated, the plaintiffs claimed that the State "breached the Act 304 Settlement" by failing to challenge the FAA Memorandum. A claim alleging breach of settlement requires that the plaintiffs establish that a settlement agreement, or contract, existed between the parties. *See Harris v. DeSoto,* 80 Hawai‘i 425, 432, 911 P.2d 60, 67 (1996) ("a settlement agreement is a contract"). Therefore, the plaintiffs' claim for breach of settlement requires that they first establish that a contract or settlement agreement existed between them and the State.

In the instant case, because the plaintiffs suggest that *legislation—i.e.,* Act 304—constituted a contract or settlement agreement, this court must review the language of the act and the circumstances surrounding its enactment. *See Koster v. City of Davenport, Iowa,* 183 F.3d 762, 766 (8th Cir.1999) (citations omitted). The United States Supreme Court provides further explanation on the determination of whether legislation contractually binds government:

For many decades, this Court has maintained that *absent some clear indication that the legislature intends to bind itself*

contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." Dodge v. Board of Education, 302 U.S. 74, 79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937). See also Rector of Christ Church v. County of Philadelphia, 24 How. 300, 302, 16 L.Ed. 602 (1861) ("Such an interpretation is not to be favored"). This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 104–105, 58 S.Ct. 443, 447–448, 82 L.Ed. 685 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, " '[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.' " Keefe v. Clark, 322 U.S. 393, 397, 64 S.Ct. 1072, 1074, 88 L.Ed. 1346 (1944) (quoting Charles River Bridge v. Warren Bridge, 11 Pet. 420, 548, 9 L.Ed. 773 (1837)). Thus, *the party asserting the creation of a contract must overcome this well-founded presumption,* Dodge, supra, 302 U.S., at 79, 58 S.Ct., at 100, *and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.*

In determining whether a particular statute gives rise to a contractual obligation, "it is of first importance to examine the language of the statute." Dodge v. Board of Education, supra, at 78, 58 S.Ct., at 100. See also Indiana ex rel. Anderson v. Brand, supra, 303 U.S., at 104, 58 S.Ct., at 447 ("Where the claim is that the State's

of the OHA trustees. Haw. Const. art. XII, § 6. Accordingly, by positing that the State violated the foregoing sections of the Hawai‘i Constitu-

tion, the plaintiffs argue that the State breached its duties as trustee of the public land trust.

policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract"). "If it provides for the execution of a written contract *on behalf of the state* the case for an obligation binding upon the state is clear." 302 U.S., at 78, 58 S.Ct., at 100 (emphasis supplied). But *absent "an adequate expression of an actual intent" of the State to bind itself, Wisconsin & Michigan R. Co. v. Powers,* 191 U.S. 379, 386–387, 24 S.Ct. 107, 108–109, 48 L.Ed. 229 (1903), *this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party.*

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–67, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (some emphases in original, some added) (brackets in original); *see also United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 18 n. 14, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."). Courts proceed cautiously in identifying those statutes which contractually bind the government to its terms because:

> Finding a public contractual obligation has considerable effect. It means that a subsequent legislature is not free to significantly impair that obligation for merely rational reasons. Because of this constraint on subsequent legislatures, and thus on subsequent decisions by those who represent the public, there is … a higher burden to establish that a contractual obligation has been created.

*Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.,* 173 F.3d 46, 60 (1st Cir.1999).

Based on the foregoing principles, this court must, with regard to Act 304, first "examine the language of the statute" to determine whether it provides for "the execution of a written contract on behalf of the state" or otherwise evinces clear intent to bind the State to its terms. *Nat'l R.R. Pas-senger Corp.,* 470 U.S. at 466–67, 105 S.Ct. 1441 (citations and emphasis omitted). The plaintiffs fail—as they did before the circuit court—to point to any language in Act 304 showing legislative intent to enter into a contract. Indeed, nowhere in Act 304 does it provide for the execution of a written contract or utilize language indicating an intent to create a contract. Nevertheless, the plaintiffs urge this court to look to "the circumstances of Act 304's passage, including the legislative history reflecting its characterization as a negotiated 'settlement' and 'conclusion' or 'resolution[.]' " Specifically, the plaintiffs contended in their complaint that:

> The State executive and legislative branches and OHA entered into negotiations to clarify OHA's "income and proceeds from that pro rata portion of the trust referred to in" Article XII, Section 4 of the Constitution of the State of Hawaii. The settlement agreement they reached was documented as Act 304 (1990), hereinafter referred to as the "Act 304 Settlement." In virtually every committee report or comment on Act 304, the term "settlement" or "resolution" is used to characterize the agreement reached. In addition, the legislative history surrounding Act 304 clearly demonstrates a legislative commitment not to unilaterally repeal or modify Act 304.

(Some brackets in original.)

We acknowledge that the legislative history behind Act 304 utilizes the terms "settlement" and "resolution." However, the stated purpose of the Act was:

> to clarify the basis for determining the revenue due to [OHA] for the betterment of the conditions of native Hawaiians under provisions of the State Constitution and Chapter 10, [HRS].
>
> More specifically, this bill *amends the definitions of "public land trust" and "revenues" to clarify which lands make up the public land trust* for native Hawaiians and the general public and which revenues derived from those lands will be used in determining the income and proceeds to be transferred to [OHA] to be used for the betterment of native Hawaiians.

Hse. Stand. Comm. Rep. No. 648–90, in 1990 House Journal, at 1082 (1990) (emphases added). Further, the legislative history indicates that Act 304 was meant to be "the *first step* in the resolution of a series of complex questions about what constitutes the extent of the trust holdings and the trust obligations of the State to the native Hawaiians," Hse. Stand. Comm. Rep. No. 306–90, in 1990 House Journal, at 960 (emphasis added), and "*leaves open for future negotiations* the question of entitlements for Hawaiians with less than fifty per cent Hawaiian blood and the question of establishing a separate trust fund to benefit all Hawaiians regardless of blood quantum." Hse. Conf. Comm. Rep. No. 91, in 1990 House Journal, at 801 (emphasis added); *see also* Hse. Stand. Comm. Rep. No. 648–90, in 1990 House Journal, at 1082; Sen. Stand. Comm. Rep. No. 3073, in 1990 Senate Journal, at 1253. Therefore, we believe that the clear and specific stated purpose of the Act reveals that the legislature did not intend, as the plaintiffs urge, to enter into an enforceable contract with the plaintiffs or restrict successive legislatures from modifying or repealing any language therein. Accordingly, absent the "clear and unambiguous" intent required to contractually bind the State, we hold that Act 304 does not constitute a valid and enforceable contract or settlement agreement between the parties. We, therefore, conclude that the plaintiffs' claim for breach of settlement was properly dismissed inasmuch as it failed to state a claim upon which any relief could be granted.

b. *the plaintiffs' claim for breach of trust*

■ With respect to the plaintiffs' claim for breach of trust, the plaintiffs argue on appeal that "[t]he State, as trustee of the ceded lands trust, may be held accountable under standards applicable to trustees of private trusts." They also assert that "[t]he questions raised by [their] breach of trust claim do not present a political question because (1) they are in fact the 'traditional fare' of the judiciary, (2) there are adequate judicially manageable standards for resolving them, and (3) they do not involve an initial policy determination of a kind best left to the legislature."

In response, the State contends that the plaintiffs have failed to state a claim for breach of trust because, *inter alia*,

■ [t]he State's fiduciary duty is owed not only to native Hawaiians, but also to the general public. OHA now relegates the general public to non-beneficiaries. Even if the State settled a claim against the State to benefit the general public at the expense of OHA—a proposition that is legally unsustainable ... there was no breach of trust. Neither the Admission Act nor the Hawaii Constitution confers any preference or priority on the purpose of the betterment of native Hawaiians ... [and]

■ whether or not a trustee has acted with the requisite prudence is adjudged *not hindsightfully by outcome* but solely by the circumstances existing *at the time* of the act. In determining whether a trustee has acted prudently, the court must look at the facts as they existed, *unaided by subsequent events*.

Despite paying lip service to the circumstances existing at the time principle, OHA has erroneously premised its breach of trust claim *solely on the alleged outcome* that the Forgiveness Act caused the demise of Act 304 and therefore the decision in *OHA I.* OHA does not and cannot even *allege* that the State's decision to accept the Forgiveness Act was not prudent *at the time.*

(Emphases in original.) The State correctly states that "the court is not required to accept conclusory allegations on the legal effect of the events alleged," such as the allegation that "the State breached its fiduciary duties to OHA." Likewise, this court also need not accept the conclusion that "[t]he State did not breach its trust duties." Rather, as previously stated, we must first decide whether the plaintiffs stated a proper *claim* for breach of trust.

In the instant case, the complaint alleges that the State breached its trust duties by:

(1) failing to challenge the positions set forth in the FAA Memorandum; (2) resolving its dispute with the FAA by obtaining a forgiveness of the prior $30 million

payment in exchange for a promise not to make future airport revenue payments to OHA and not to appeal the positions set forth in the FAA Memorandum; (3) breaching the trust duty of impartiality by not challenging the positions set forth in the FAA Memorandum in order to use them as a sword in [*OHA I*] and subsequent appeal; (4) failing to timely advise OHA that the State was not going to continue to challenge the positions set forth in the FAA Memorandum or IG Report, and that it was planning to settle with the federal government, in order to provide OHA with a fair opportunity to take measures to step into the State's position to oppose the FAA; and, (5) failing to obtain instructions from the Court on how to proceed given its conflict position of defending the State against OHA in *OHA I* and having a duty to challenge the positions set forth in the FAA Memorandum.

As stated previously, the State holds ceded lands in a public trust for five purposes, one of which is for the benefit of native Hawaiians. *See* Section I.A. Article XII, section 4 of the Hawai'i State Constitution, *see supra* note 15, confirms that lands granted to the State by the Admission Act "shall be held by the State as a public trust for native Hawaiians and the general public," thereby designating two groups of beneficiaries. Under the Admission Act, the State assumed a fiduciary duty to hold the land "together with the proceeds from the sale or other disposition of [ceded lands] *and the income therefrom.*" Admission Act, § 5(f) (emphasis added). As this court held in *Pele Defense Fund v. Paty,* 73 Haw. 578, 837 P.2d 1247 (1992) [hereinafter, *Pele Defense* ], "[a]rticle XII, § 4 imposes a fiduciary duty on Hawaii's officials to hold ceded lands in accordance with the § 5(f) trust provisions." *Id.* at 605–06, 837 P.2d at 1264.

This court further noted that, in administering the ceded lands, the State is subject to the standard of "high fiduciary duties" recognized in *Ahuna v. Department of Hawaiian Home Lands,* 64 Haw. 327, 338, 640 P.2d 1161, 1168 (1982), which include "well-settled" principles laid out by the federal courts in dealing with lands set aside by Congress in trust for the benefit of native Americans and Alaskans, noting that: (1) "the conduct of the government as trustee is measured by the same strict standards applicable to private trustees"; (2) one specific trust duty includes "the obligation to administer the trust solely in the interest of the beneficiary"; and (3) "*a trustee must deal impartially when there is more than one beneficiary.*" *Id.* at 339–40, 640 P.2d at 1168–70 (emphasis added).

The common law of trusts also identifies two instances where a trustee is under a "duty to inform." First, *a fiduciary has "a duty to give beneficiaries upon request 'complete and accurate information as to the nature and amount of trust property.' "* *Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 656 (4th Cir.1996) (quoting Restatement (Second) of Trusts § 173 (1959)). Second, in limited circumstances, a trustee is required to provide information to the beneficiary even when there has been no specific request:

> Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information.... [However,] *he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection [in dealing with a third person with respect to his interest.]*

*Griggs v. E.I. DuPont de Nemours & Co.,* 237 F.3d 371, 380–81 (4th Cir.2001) (emphasis added) (ellipsis and some brackets in original) (citation omitted).

In their complaint, the plaintiffs alleged that the State violated, *inter alia,* the duty of impartiality and the duty to inform them of its decisions regarding actions in response to the Federal government's position on its grant conditions. They further alleged that, due to the State's conduct, the trust beneficiaries, represented by the plaintiffs, lost the right to receive any future income from airport revenues for the use of ceded lands under the Admission Act, the Hawai'i State Constitution, HRS Chapter 10, and Act 304. Pursuant to HRS §§ 10–13.5 and –16, OHA

may bring suit in its corporate name, act as trustee in carrying out its obligations, and serve as a receptacle for the public lands proceeds under the public trust. Therefore, the plaintiffs are entitled to bring a claim for breach of the public lands trust and states a proper claim upon which relief could, under the proper circumstances, be granted. Consequently, we next examine the State's defenses of (i) sovereign immunity, (ii) notice, and (iii) statute of limitations.

### i. sovereign immunity

The State contends that sovereign immunity bars the plaintiffs' claim for breach of trust. The State focuses on HRS chapter 673 (codifying the Native Hawaiian Trusts Judicial Relief Act) as a specific statute regarding waiver of the State's sovereign immunity. Specifically, the State contends that the waiver is unavailable under chapter 673 because it "applies only to claims for 'the management or disposition of trust funds and resources of [the land trust,]' " whereas, here, the plaintiffs have "not even alleged improper management or disposition of trust assets." (Brackets in original.) (Citation and emphasis omitted). Second, the State argues that HRS § 673-9 (1993), quoted *infra*, which provides that the waiver is inapplicable to suits brought by OHA involving its proportionate share of ceded land or special fund revenues, applies such that it reserves the issue of OHA's proportionate share to the legislature. Third, the State contends that the implied waiver of sovereign immunity under *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), and *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), are "irrelevant to this case [because] Hawaii has a specific statute (chapter 673) [and] . . . *[t]here is no federal counterpart to chapter 673.*" (Emphasis in original.)

The plaintiffs counter that (1) HRS § 673-1 does apply to their case because their claims relate to the mismanagement of trust assets or resources and, (2) if this court is to read section 673-9 broadly to exclude all claims "involving" OHA's proportionate share of ceded land and special fund revenues, then

"the exception would swallow the rule" as any claim for unpaid revenues would necessarily "involve" OHA's proportionate share of revenues. The plaintiffs further contend that, even if chapter 673 does not apply, damages still may be sought here because, under *Mitchell* and *White Mountain Apache Tribe*, "sovereign immunity is waived where a government undertakes statutory or constitutional trust obligations."

Generally, "[a] sovereign state is immune from suit for money damages, except where there has been a 'clear relinquishment' of immunity and the State has consented to be sued." *Bush v. Watson*, 81 Hawai'i 474, 481, 918 P.2d 1130, 1137 (1996) (quoting *Pele Defense*, 73 Haw. at 605, 837 P.2d at 1264) (internal quotation marks omitted). Although the United States Supreme Court has held in *Mitchell* and *White Mountain Apache Tribe* that, in specific circumstances, the federal government may be held liable for money damages resulting from breaches of trust, our courts have not yet determined whether claims based on breaches of the public lands trust qualify for the same waiver. In *Pele Defense*, which was decided a decade after *Mitchell*, this court adopted the rule in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), that distinguished between allowable "prospective" relief and disallowable "retrospective" relief, stating that:

> If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. This is true even though accompanied by a substantial ancillary effect on the state treasury. However, relief that is tantamount to an award of damages for a past violation of law, even though styled as something else, is barred by sovereign immunity.

73 Haw. at 609, 837 P.2d at 1266 (citations, internal quotation marks, and ellipses omitted). Subsequently, in *Bush*, this court noted that:

> We decline to adopt the federal courts' narrow view that a claim for relief based on past illegal action is necessarily "retrospective." *See Han [v. Dep't of Justice]*, 824 F.Supp. [1480,] 1489 [(D. Haw.1993)],

*aff'd*, 45 F.3d [333], 338 [(9th Cir.1995)]. As suggested by counsel for the Appellants during oral argument, such an interpretation would force potential claimants to discern the potential impact of proposed agency action, ascertain the threat of injury, and acquire an attorney to draft a complaint and file suit (subject to sanctions under [HRCP] Rule 11)[.] *Rather than imposing such an onerous burden on the potential claimants, the crucial inquiry under our sovereign immunity principle is whether the relief sought for a past violation of law is "tantamount to an award of damages" or would merely have an "ancillary" effect on the state treasury. Pele [Defense],* 73 Haw. at 609–10, 837 P.2d at 1266 (citing *Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1985)[1986]).

81 Hawai'i at 482 n. 9, 918 P.2d at 1138 n. 9 (emphasis added). Given the principles in *Pele Defense* and *Bush,* it follows that sovereign immunity may not be invoked by the State if the suit seeks "prospective," *i.e.,* injunctive, relief and the State fails to carry its burden of proving with specific facts that the effect on the State treasury will be directly, substantially, and quantifiably impacted.[16] We, therefore, first examine the nature of the relief being sought to determine if it is "prospective," *i.e.,* seeking an injunction against the State from violating constitutional or statutory provisions, or "retrospective," *i.e.,* seeking monetary or other damages, in nature.

The plaintiffs in this case essentially seek injunctive and declaratory relief, as well as monetary damages, based on the State's decision not to challenge the FAA regarding airport revenue payments and the State's failure to inform the plaintiffs of that decision. Inasmuch as all of the plaintiffs' claims for relief are based on past conduct, it would appear that the relief being sought is retrospective in nature and that, therefore, prospective or injunctive relief is not available. However, as previously noted in *Bush,* this court has rejected "the federal court's narrow view that a claim for relief based on past illegal action is necessarily 'retrospective.' " *Bush,* 81 Hawai'i at 482 n. 9, 918 P.2d at 1138 n. 9 (citation omitted). If there is a continuing violation of or ongoing breach resulting from a past action, then prospective relief, *i.e.,* an injunction to stop the continuing violation, is available. Here, the plaintiffs seek "injunctive" relief that is tantamount to an award of damages for past actions inasmuch as the injunction relates to payments that would be owed to OHA but for the passage of the Forgiveness Act and the subsequent invalidation of Act 304. Unlike in *Bush, see supra* note 16, the plaintiffs here do not seek an injunction to stop a continuing violation of law or breach of trust. Indeed, there is no statute from which to enjoin the State from violating inasmuch as the invalidation of Act 304 has once again left this court without judicially manageable standards to determine the State's payment obligations to OHA under HRS chapter 10. As such, the relief sought for the instant breach of trust claims is "retrospective," *i.e.,* for declaratory relief and monetary damages. We, therefore, examine whether the State has "clearly relinquished" its sovereign immunity with respect to retrospective relief.

In *Taylor–Rice v. State,* 105 Hawai'i 104, 94 P.3d 659 (2004), this court noted the following principles used by federal courts when construing statutes regarding sovereign immunity:

(1) "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign," *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (citations omitted); (2) a waiver of sovereign immunity "must be unequivocally expressed in statutory text," *id.* (citation

---

**16.** We note that the requirement that such impact be proven by specific facts flows from this court's holding in *Bush* that "prospective" injunctive relief that barred the Department of Hawaiian Homelands from honoring existing improper third-party agreements with non-beneficiaries and barring the Department from creating new agreements was permitted where it did not have a substantial direct effect on the state treasury. 81 Hawai'i at 482, 918 P.2d at 1138. For further discussion, *see* Eric K. Yamamoto, *Courts and the Cultural Performance: Native Hawaiians' Uncertain Federal and State Law Rights to Sue,* 16 U. Haw. L.Rev. 1 (1994) (discussing the prospective versus retrospective distinction).

omitted); (3) "a statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text," *id.*; (4) "it is not a court's right to extend the waiver of sovereign immunity more broadly than has been directed by the Congress," *United States v. Shaw*, 309 U.S. 495, 502, 60 S.Ct. 659, 84 L.Ed. 888 (1940); and (5) sovereign immunity "is not to be waived by policy arguments," *United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 663, 67 S.Ct. 601, 91 L.Ed. 577 (1947).

*Id.* at 110, 94 P.3d at 665 (brackets omitted).

HRS § 673–1 provides in relevant part that, "[t]he State waives its immunity for any breach of trust or fiduciary duty resulting from the acts or omissions of its agents ... in the management and disposition of trust funds and resources of [the native Hawaiian public trust.]" A plain reading of HRS § 673–1 indicates that it unequivocally waives the State's sovereign immunity, and, inasmuch as HRS § 673–4(a) (1993) provides for relief only in the form of "land or monetary damages to restore the trust which has been depleted as a result of any breach of trust duty," the waiver specifically applies to suits for retrospective relief. Thus, as the State correctly argues, we need not look to the *Mitchell* line of cases to determine whether there is an implied waiver of sovereign immunity; rather, we examine whether HRS chapter 673 is applicable to the instant claims.

The State contends that chapter 673 is inapplicable because the plaintiffs "have not even alleged improper management or disposition of trust assets," under section 673–1. We disagree. As the facts indicate and as discussed previously, the instant breach of trust claims relate to the State's handling of its trust responsibilities with regard to a significant portion of revenues paid and payable to OHA, *i.e.*, airport special fund revenues. Inasmuch as the revenues are derived from the ceded lands trust, they are trust assets and were payable to OHA, as provided at that time under Act 304. As such, the claims relate to the state's fulfillment of its fiduciary duties and its management of trust assets.

The State next contends that, even if the claims fall under HRS § 673–1, section 673–9 reserves the issue for the legislature. HRS § 673–9 provides,

**Inapplicability to share of office of Hawaiian affairs.** This chapter shall not apply to suits in equity or law brought by or on behalf of [OHA] in which the matters in controversy involve the proportionate share of ceded land or special fund revenues allocated to [OHA] by the legislature.

(Bold emphasis in original.) We agree with the plaintiffs that this suit does not involve the proportionate share of OHA's revenues. At the time the conduct at issue occurred, OHA's proportionate share of revenues was set at twenty percent under Act 304. The instant breach of trust claims are for damages resulting from the State's breach of trust duties and do not require a determination of OHA's proportionate share of revenues, unlike the suit in *Yamasaki*. Were we to hold otherwise, as the plaintiffs contend, the "exception [under HRS § 673–9] would swallow the rule." Accordingly, we hold that HRS chapter 673 applies to the instant claims. We now examine whether the plaintiffs have complied with chapter 673's statutory requirements with respect to notice under HRS § 673–3 (1993) and statute of limitations under HRS § 673–10 (Supp.2004), quoted *infra*.

### ii. Notice Under HRS § 673–3

▇ In opposing the State's motion to dismiss, the plaintiffs contended that the written notice provision under HRS § 673–3 is inapplicable to their claims because that section is entitled "Exhaustion of Administrative Remedies." HRS § 673–3 states in pertinent part that,

[b]efore an action may be filed in circuit court under this chapter, the party filing suit *shall have exhausted all administrative remedies available, **and** shall have given not less than sixty days written notice prior to filing of the suit that unless appropriate remedial action is taken suit shall be filed.*

(Emphases added.) Specifically, the plaintiffs maintain that, inasmuch as there were no administrative remedies available, the entire section is inapplicable, including the sixty-day-notice requirement. We disagree.

A plain reading of the statute indicates that administrative remedies must be exhausted *and* written notification of not less than sixty days must be given. Thus, notwithstanding the absence of administrative remedies, the plaintiffs must still have complied with the sixty-day-notice requirement in order to meet the statutory prerequisites for filing suit. Their failure to comply with the notice requirement precludes us from reviewing any claims brought under chapter 673. *See Garcia v. Kaiser Found. Hosp.*, 90 Hawai'i 425, 441, 978 P.2d 863, 879 (1999) (holding that "the circuit court did not err in concluding that it had no subject matter jurisdiction as a result of Plaintiff's failure to comply with the requirements of HRS § 671–12," which mandated that such claims be first filed with the medical claim conciliation panel prior to filing suit); *see also Hallstrom v. Tillamook County*, 493 U.S. 20, 33, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (holding that (1) the sixty-day-notice requirement in the citizen suit provision of the Resource Conservation and Recovery Act of 1976 (RCRA) was a mandatory precondition to suit and (2) the plaintiffs' failure to comply resulted in dismissal as the action was barred by the terms of the statute). However, even assuming *arguendo* that the statute does not apply, the claims are nonetheless barred by the statute of limitations under HRS § 673–10, as discussed below.

### iii. Statute of Limitations Under HRS § 673–10

 The statute of limitation requirement under chapter 673 is found in HRS § 673–10, which provides:

17. HRS 657–1.5 provides:
 **Limitation of actions not applicable to State.** No limitation of actions provided for under this or any other chapter shall apply to bar the institution or maintenance of any action by or on behalf of the State and its agencies, unless the State is specifically designated in such a statute as subject to the limitation period contained therein. No defense to any action brought by the State or any of its agencies shall be predicated upon the lapse of time. (Bold emphasis in original.) (Underscored emphasis added.)

18. HRS § 10–4 states that "[t]here shall be an office of Hawaiian affairs constituted as a body

**Limitation on actions; native Hawaiians.** Every claim arising under this chapter shall forever be barred unless the action is commenced within two years after the cause of action first accrues; provided that this statute of limitations shall be tolled until July 1, 1990; provided that the filing of the claim in an administrative proceeding pursuant to this chapter shall toll any applicable statute of limitations, and any such statute of limitations shall remain tolled until ninety days after the date the decision is rendered in the administrative proceeding; provided further that any cause of action that first accrues after July 1, 1995 shall forever be barred unless action is commenced within two years after the cause of action first accrues.

(Bold emphasis in original.) (Underscored emphases added.)

The plaintiffs, however, argue that, because OHA is a state agency, it is "immune from the statute of limitations," pursuant to HRS § 657–1.5 (1993).[17] The State contends that "HRS § 657–1.5 does not exempt the plaintiffs from the statute of limitations for this lawsuit [because] OHA is a 'separate entity independent of the executive branch (HRS § 10–4 [ (Supp.2003)[18] ]), and OHA brought this suit in its own corporate name under § 10–16 [(1993)[19]], rather than as an agency of the State on behalf of the people of the State." We agree with the State.

Under HRS § 10–16, OHA "may sue . . . in its corporate name," and, pursuant to HRS § 10–4, the corporation is a "separate entity independent of the executive branch."

corporate which shall be a separate entity independent of the executive branch."

19. HRS § 10–16 provides in pertinent part:
 (a) [OHA] may sue and be sued in its corporate name. The State shall not be liable for any acts or omissions of the office, its officers, employees, and the members of the board of trustees, except as provided under subsection (b).
 (b) In matters of tort, the office, its officers and employees, and the members of the board shall be subject to suit only in the manner provided for suits against the State under chapter 662 [relating to tort liability].

Therefore, OHA does not fall under HRS § 657–1.5 such that the instant claims are immune from any applicable statutes of limitations.

■■■ The plaintiffs also contend that, because their claims are based in equity, "the court is not bound by statutes of limitation[.]" In response, the State contends that "this court cannot expand the legislature's limited waiver of immunity by 'equitable disregard' of the conditions of the waiver." We agree that we are held to the bounds of the applicable statutes of limitation inasmuch as they set specific limits on the State's waiver of sovereign immunity that we must "strictly construe" and cannot extend under these circumstances. The application of equitable tolling in this jurisdiction has been, for the most part, in the insurance context where a statute of limitations was tolled from the time a claim for benefits was filed. *See Wright v. State Farm Mut. Auto. Ins. Co.*, 86 Hawai'i 357, 362, 949 P.2d 197, 202 (App. 1997).

The federal courts generally agree that statutes of limitations accompanying a waiver of sovereign immunity should be narrowly construed. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (citation omitted). However, unless Congress has provided otherwise, the federal courts generally apply a rebuttable presumption that a statute of limitation is subject to equitable tolling. *Id.* at 94, 111 S.Ct. 453. In order to toll a statute of limitations for a complaint filed after its expiration, a plaintiff must demonstrate "(1) that he ... has been pursuing his right diligently, and (2) that some extraordinary circumstance stood in his way." *Felter v. Norton*, 412 F.Supp.2d 118, 126 (D.D.C.2006) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 417, 125 S.Ct. 1807, 1814, 161 L.Ed.2d 669 (2005); *Zerilli–Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir.2003)). Extraordinary circumstances are circumstances that are beyond the control of the complainant and make it impossible to file a complaint within the statute of limitations.

*Id.* (citing *United States v. Cicero*, 214 F.3d 199, 203 (D.C.Cir.2000)).

In the instant case, the plaintiffs do not allege any facts or cite any legal authorities in support of their claim that equitable tolling applies in this case. Moreover, we are not aware of any facts in the record to indicate why the plaintiffs could not have brought their breach of trust claims within the two-year statute of limitations. The plaintiffs, however, believe that the original complaint was filed within two years of when they "knew or reasonably should have known that an actionable wrong ha[d] been committed." They assert that, "[i]n order for the statute of limitation period to commence, the plaintiff must have suffered, *actual,* rather than *potential,* injury." (Emphasis in original.) The plaintiffs explain that,

> before *OHA I* was decided, [the plaintiffs] at most knew of the mere possibility that Act 304 might suffer demise by virtue of the Forgiveness Act and the State's improper conduct underlying it. But [the plaintiffs] did not know, and could not have known, of any *actual loss* until it *happened* when the Hawaii Supreme Court in *OHA I* actually *held* it to be in conflict "with provisions of federal law."
>
> . . . .
>
> Thus, the damage to [the plaintiffs] was the *permanent* loss of the right to receive monies-from whatever source-under Act 304, which happened when Act 304 was repealed. Before *OHA I,* no court had ever "held" that Act 304 conflicted with any other law. Until *OHA I,* the State's official revisor left Act 304 intact in the [HRS].

(Emphases in original.) The State, on the other hand, believes that the plaintiffs are "wrong on both the facts and the law in asserting that [their] claims against the State did not *accrue* until September 2001 [(when *OHA I* was filed).]" (Emphasis in original.) Specifically, the State argues that "[t]he facts are that, as of June 10, 1999[20], the plaintiffs knew that [they] had lost all airport revenues." Thus, the State maintains that the

---

20. In its answering brief, the State explains that, on June 10, 1999, "the Governor made clear that the State would *not* pay OHA airport revenues in

violation of federal law *and would not pay equivalent amounts from other sources."* (Emphasis in original.)

plaintiffs' complaint, filed on July 21, 2003, was barred by the statute of limitations.

In *Pele Defense*, this court held that the date the cause of action accrued in that case was "when [plaintiffs] *discovered or should have discovered* the breach of the [public lands] trust [duties], the injury to its members, and the connection between the breach and the injury," 73 Haw. at 598, 837 P.2d at 1260 (emphasis added), comparing its holding to the similar rule articulated in *Yamaguchi v. Queen's Medical Center*, 65 Haw. 84, 90, 648 P.2d 689, 693–94 (1982), a medical malpractice case.[21] In so holding, the court—as plaintiffs correctly note—applied HRS § 657–7 (1993),[22] the "general" *personal injury* statute of limitations, to the plaintiffs' section 1983 claims, pursuant to the United States Supreme Court's direction that a state's " 'residual or general personal injury statute of limitations applies' " to all section 1983 claims brought in state courts. *Pele Defense*, 73 Haw. at 598, 837 P.2d at 1260 (quoting *Owens v. Okure*, 488 U.S. 235, 236, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)).

We recognize that the instant claims are not based on federal law, but on state law claims pursuant to chapter 673. This court, however, has not addressed the accrual of a cause of action for breach of trust outside the context of section 1983 claims, and, as stated previously, HRS § 673–10 is also untested. Federal court cases involving breach of trust claims against a government trustee provide guidance on the instant issue. In *Shoshone Indian Tribe of Wind River Reservation v.*

*United States*, 364 F.3d 1339 (Fed.Cir.2004), the United States Court of Appeals for the Federal Circuit (court of appeals) explained that:

> A cause of action for breach of trust traditionally accrues when the trustee "repudiates" the trust and the beneficiary has knowledge of that repudiation. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed.Cir.1988); *Restatement* (Second) of Trusts § 219 (1992); *Cobell [v. Norton*, 260 F.Supp.2d 98, 105 (D.D.C. 2003)]; *Manchester Band of Pomo Indians [v. United States*, 363 F.Supp. 1238, 1249 (N.D.Cal.1973)]. A trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee. *Jones v. United States*, 801 F.2d 1334, 1336 (Fed.Cir.1986); *Philippi v. Philippe*, 115 U.S. 151, 5 S.Ct. 1181, 29 L.Ed. 336 (1885). The beneficiary, of course, may bring his action as soon as he learns that the trustee has failed to fulfill his responsibilities. 3 *Scott on Trusts* §§ 199.3, 205 (2001).

*Id.* at 1348. In the underlying suit in *Jones v. United States*, 9 Cl.Ct. 292 (Cl.Ct.1985), *aff'd*, 801 F.2d 1334 (Fed.Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987), the United States Claims Court (claims court) held, and the court of appeals affirmed—as plaintiffs assert here—that the government's failure to fulfill its fiduciary responsibility "constituted an implicit repudiation of the trust relationship[.]" *Id.* at 296 (footnote omitted).[23] The *Jones*

---

**21.** We have also previously held in the personal injury context that the statute of limitations begins to run when *at least some damage* is suffered and not when the full development of damages occurs or the ultimate effect of the breach of duty is known. *Yoshizaki v. Hilo Hosp.*, 50 Haw. 1, 5, 427 P.2d 845, 847 (1967).

**22.** HRS § 657–7, entitled "Damages to persons or property," provides that "[a]ctions for the recovery of compensation for damages or injury to persons or property shall be instituted within two years after the cause of action accrued, and not after[.]"

**23.** In *Jones*, Hattie Davis Rogers was allotted property in Nez Perce County, Idaho. *Id.* at 294. The land was held in trust by the United States, and the federal government refused her request for the title to the property in 1914. *Id.* Nez

Perce County made two attempts to tax the property. In 1918, after the first assessment, the United States, as trustee, obtained a district court decree voiding the assessment and enjoining future taxation. *Id.* However, in 1923, the County again levied taxes against the property and the United States never returned to the district court to enforce the 1918 decree. Davis Rogers was evicted in 1927, and the County conveyed the property in 1937. *Id.* In 1972, six years after Davis Rogers' death, successors in interest to Davis Rogers brought suit against Nez Perce County and the United States. Five years later, the United States was realigned as a party plaintiff to the action, and, in 1979, the district court ordered the return of the property. The Ninth Circuit subsequently held that they were entitled to damages from the illegal use of the property, but reduced the award to the successors due to the United State's lack of diligence in

court, however, went on to state that the fiduciary's implicit repudiation "should have put the beneficiary on notice that she might suffer damages[,]" *id.*, further noting the fact "[t]hat [the plaintiffs] *may not have fully appreciated the legal consequences* flowing from defendant's nonfeasance—including the possibility that they might be entitled to money damages—*does not toll the statute of limitations.*" *Id.* at 295 (emphases added) (citing *Menominee Tribe of Indians v. United States,* 726 F.2d 718 (Fed.Cir.1984)) (other citations omitted). The claims court concluded that the plaintiffs' claims did not accrue when they learned of the full extent of their damages, but rather they accrued—as in *Pele Defense*—when the plaintiffs had learned of: (1) the conduct establishing the government's liability or breach; (2) the injury to the trust beneficiaries and the link between the injury and the conduct; and (3) some damage to the trust. *Jones,* 9 Cl.Ct. at 296. We, therefore, address whether the plaintiffs knew of the material facts of their claims, *i.e.*, the breach of duty, injury and causal connection, and some damage to the trust, within two years of July 21, 2003—the date they filed the instant complaint.

With respect to the first element, *i.e.*, the discovery of the breach, several facts alleged in the first amended complaint indicate that the plaintiffs discovered or should have discovered the breach of trust as early as August 19, 1997. As the plaintiffs allege, on July 22, 1997, a U.S. Senate Report No. 105–55 regarding the Department of Transportation and Related Agencies Appropriations Bill, 1998, stated:

> Federal aviation law ... prohibits the diversion of airport revenues for non-airport purposes. Recently, the Department of Transportation Inspector General identified $30,000,000 in past payments to [OHA] as illegal diversions of airport revenues. The FAA agreed with the [IG's

Report]. However, it is unclear whether a Federal court would agree with the [Inspector General] and the FAA[,] should their determination be challenged. Given the fact that the State of Hawaii owns the lands in trust for the betterment of native Hawaiians, it is conceivable that a reviewing court could find that the payments of airport revenues were in the nature of rent, which is [a] permissible use of airport revenue.

> *To put the issue to rest, the general provision provides that the State of Hawaii is forgiven any obligation to repay past amounts diverted for trust purposes, in return for a clear congressional statement prohibiting any future diversions.*

(Emphasis added.) The plaintiffs stated in their complaint that "[t]his was the first notice OHA could have reasonably received" that the State may have decided not to challenge the FAA decision and to settle the issue. Shortly thereafter, in a letter dated August 7, 1997, from Senator Daniel Inouye, one of Hawaii's Congressional members, to OHA, Senator Inouye stated:

> *In light of the State's decision not to appeal the U.S. Department of Transportation's ruling* thereby allowing it to become final, I believe that the best course of action would be to clear the debt and allow the State and OHA to return to the negotiating table to work toward a mutually agreeable course of action *that would uphold the State's obligation to OHA from other sources.* Upon sensing that that may not be the case, I immediately included an additional provision to section 355, and an accompanying floor statement, to ensure that the Congressional intent was clear. Section 335 shall not affect the obligations to Native Hawaiians as set forth in existing statutes.

pursuing the claim. *Id.* The successors subsequently brought suit against the United States for damages resulting from the breach of trust apparently established in the initial suit. Therein, the claims court held that the plaintiffs' claim was barred by the statute of limitations, noting that:

> To hold the claim is barred by the statute of limitations does not mean that the United

States should not pay plaintiffs the money in question, or some fraction thereof. It does mean that the obligation, if there be one, cannot be satisfied through litigation in this court but must be presented directly to Congress, which retained authority over all claims against the United States that ... fall outside our jurisdictional purview.

*Id.* at 296 (citation omitted).

Further, on August 19, 1997, the Honolulu Advertiser, a local daily newspaper of general circulation, published an article written by then-attorney general Margery Bronster, entitled "Don't Litigate on OHA," wherein she stated that the State would not contest the FAA's position that using the State's airport revenues violated federal grant conditions on the use such revenues. As the plaintiffs stated in their complaint, Senator Inouye's letter and Attorney General Bronster's article "were the first notice that OHA received that the State had given up its position." Thus, the facts alleged in the complaint demonstrate that the plaintiffs were aware of the State's repudiation, *i.e.*, that an alleged breach of trust had occurred by the State's decision not to challenge the FAA's position, as early as August 19, 1997. And, alternatively, based on the discussion below, as late as July 9, 1999.

With respect to the discovery of the injury and causal connection, the facts alleged in the first amended complaint also demonstrate that the plaintiffs became aware of their initial loss of both airport revenue payments as well as payments from any other source on June 10, 1999. On that day, Governor Cayetano issued a statement of objections to Senate Bill No. 1635, which, in conjunction with Act 329, sought to provide an alternative funding mechanism due to the uncertainty surrounding Act 304 and which appropriated $16,060,000 to OHA. Therein, Governor Cayetano stated:

> [T]he trustees of [OHA] have discontinued our earlier settlement efforts and asked me to veto this bill. I understand further that the trustees prefer that the differences between the State and OHA presently pending before the Hawaii Supreme Court in [*OHA I*], be decided by the Court. *I must assume that the trustees are aware the federal legislation precludes the State's airports system from paying for the use of public trust lands with airport revenue, and that without the $16,060,000 appropriation this bill would make, there will be no **non-airport revenue** appropriation to pay for the airport system's use.*

Governor's Message, "Statement of Objections to Senate Bill No. 1635," in 1999 Senate Journal, at 803 (emphases added). Once the governor gave notice to the legislature of his objections to Senate Bill No. 1635, the legislature had until July 9, 1999—forty-five days from the date of its adjournment on May 4, 1999 (excluding Saturdays, Sundays, and holidays)—in which to reconvene in special session to reconsider Senate Bill No. 1635. Haw. Const. art. III, § 16. Inasmuch as the legislature did not override the governor's veto, the plaintiffs—having themselves requested that Governor Cayetano veto Senate Bill No. 1635—should have discovered their injury, *i.e.*, the loss of payments for the airport's use of ceded lands from the airport revenues or from any other source, as early as July 9, 1999. Moreover, with the veto of Senate Bill No. 1635 and the sunset of Act 329, the plaintiffs knew or should have known that the only payments that would be made were Act 304 payments, less the airport revenues. In other words, as Governor Cayetano made clear, his veto meant that there would be "no non-airport revenue appropriation to pay for the airport system's use." Thus, the plaintiffs should have been aware that some loss had already occurred, even if the ultimate effect, *i.e.*, the repeal of Act 304, was not yet known until this court's decision in *OHA I*.

The plaintiffs' citation to *Mun Seek Pai v. First Hawaiian Bank*, 57 Haw. 429, 558 P.2d 479 (1977), for the proposition that the statute of limitations does not run until the damage is "actual and permanent in character, as opposed to merely potential or contingent," has no effect on the instant case. In *Mun Seek Pai*, this court held that, where a debtor made a new promise to pay a debt subject to a condition, the cause of action on the promise does not accrue until the condition is performed. 57 Haw. at 435, 558 P.2d at 482. There, this court, quoting *Segelken v. Hawaiian Trust Co.*, 20 Haw. 225, 229 (1910), noted that:

> When the payment of a claim or the liability of a party is made dependent on the performance of any condition precedent or the happening of any contingency, a right of action does not accrue, or the statute begin to run, until the performance of such

condition or the happening of such contingency.

*Mun Seek Pai*, 57 Haw. at 435, 558 P.2d at 483 (other citations and brackets omitted). In both *Mun Seek Pai* and *Segelken*, however, there was a condition or contingency that had to occur before the plaintiffs in those cases could bring suit in court. In *Segelken*, for example, the plaintiffs' right to money from a trust fund came into existence only upon her death. Here, there was no condition precedent or contingency such that the plaintiffs could not have brought their breach of trust claims within the statutory period. The plaintiffs' breach of trust claims cannot be said to have been contingent on *OHA I* as the loss suffered by the plaintiffs occurred during the pendency of *OHA I* and not because of *OHA I*.

The plaintiffs in *Jones* made a similar argument regarding the need to wait for a judicial determination of their rights, stating that "their [breach of trust] claim did not accrue, for statute of limitations purposes, until the district court litigation had been completed and they first learned that they had suffered monetary damages because of defendant's breach of trust." 9 Cl.Ct. at 294. There, the claims court held that the statute of limitations was not tolled even where "[the plaintiffs] may not have fully appreciated the legal consequences flowing from defendant's nonfeasance—including the possibility that they might be entitled to money damages[.]" *Id.* at 295. Similarly, although the plaintiffs here may not have appreciated all the legal consequences flowing from the State's alleged nonfeasance or the extent of their monetary damages, they knew of the material facts of the instant breach of trust claims *on or before July 9, 1999*. The plaintiffs did not file their complaint until *July 21, 2003*, more than four years after the claims first accrued, and over two years after the applicable statute of limitations ended on July 9, 2001. Accordingly, the circuit court did not err in dismissing the plaintiffs' complaint. *See Romero v. Star Markets, Ltd.*, 82 Hawai'i 405, 416, 922 P.2d 1018, 1029 (App.1996) (noting that "it is now common to allow an affirmative defense to be asserted by a motion under [HRCP] Rule 12(b)(6) when the validity of that defense is apparent from the face of the pleading") (citation omitted); *see also Rivera v. England*, 360 F.Supp.2d 1104, 1111 (D.Haw.2005) (holding that "[a] motion under [the analogous FRCP] Rule 12(b)(6) should also be granted if an affirmative defense or other bar to relief is apparent from the face of the Complaint, such as ... the statute of limitations") (citations omitted).

B. *Whether the Circuit Court Abused Its Discretion in Denying the Plaintiffs' Motion to Amend*

 The plaintiffs next contend that the circuit court erred in denying their motion for leave to amend their first amended complaint. They contend that the revised second amended complaint sought justiciable declaratory relief and that, therefore, they "should have been accorded a chance to pursue justiciable relief[.]" Furthermore, although the plaintiffs acknowledge that a court may deny a motion for leave to amend a complaint when the amendments are futile, they argue that "[t]he requested amendments were not futile because [the plaintiffs'] claims for declaratory relief and other non-damages relief was not 'frivolous' or 'legally insufficient on its face.[']" The State argues:

> There is no abuse of discretion in denying a motion for leave to amend when the proposed amendment would be futile. Here, the proposed amendments could not begin to overcome [the plaintiffs'] failure to state viable claims for breach of contract or breach of trust, the non-justiciability of the complaint, the jurisdictional bars of sovereign immunity and the statute of limitations, the constitutional separation of powers that requires legislative rather than judicial action to fill the Act 304 void, and the legal consequences of the prior adjudication in *OHA I*. The circuit court properly exercised its discretion in denying leave to re-amend.

HRCP Rule 15(a) (2000) governs the plaintiffs' request to amend their complaint and provides in pertinent part:

> *Amendments*. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which

no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires[.]

(Italicized emphasis in original.) (Underscored emphasis added.) Inasmuch as HRCP Rule 15(a) is identical to FRCP Rule 15(a), this court has looked to the general standard applied by federal courts in interpreting this rule. *Gonsalves v. Nissan Motor Corp. in Hawai'i, Ltd.*, 100 Hawai'i 149, 160, 58 P.3d 1196, 1207 (2002) (noting that, "[i]n interpreting [HRCP Rule 15(a)], this court has looked to the general standard applied by federal courts"). For example,

> In [*Bishop Trust Co., Ltd. v. Kamokila Dev. Corp.*, 57 Haw. 330, 555 P.2d 1193 (1976)] ... we referred to the following statement of the general standard employed under Rule 15(a) by the federal courts:
>
>> *In the absence of any apparent or declared reason—such as* undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment,* etc.—*the leave sought should, as the rules require, be "freely given."* (*Foman v. Davis*, 371 U.S. 178, at 182, 83 S.Ct. 227, at 230, 9 L.Ed.2d 222).

*Fed. Home Loan Mortgage Corp. v. Transamerica Ins. Co.*, 89 Hawai'i 157, 162, 969 P.2d 1275, 1280 (1998) (citing *Assoc. Eng'rs & Contractors v. State*, 58 Haw. 187, 218–19, 567 P.2d 397, 417 (1977)) (ellipses in original) (emphases added); *see also Gonsalves*, 100 Hawai'i at 160, 58 P.3d at 1207. Therefore, where the proposed amendments to a complaint are, *inter alia*, futile, a court may deny a motion for leave to file the amended complaint. *See, e.g., Lucente v. Int'l Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("One appropriate basis for denying leave to amend is that the proposed amend-

ment is futile." (Citations omitted.)). Federal courts have further explained that "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss [for failure to state a claim] pursuant to [FRCP Rule] 12(b)(6)." *Id.* (citation omitted); *see also Bradley v. Val–Mejias*, 379 F.3d 892, 901 (10th Cir.2004); *Vargas–Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 974–75 (7th Cir.2001), *cert. denied*, 537 U.S. 826, 123 S.Ct. 120, 154 L.Ed.2d 38 (2002); *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir.2000).

In the instant case, the plaintiffs twice sought to amend their first amended complaint—once prior to the circuit court's oral dismissal of the first amended complaint and once thereafter. However, the claims presented in each proposed amended complaint were identical. Specifically, both deleted the claim for "misrepresentation and non-disclosure" and added a claim alleging that the State "breached the covenant of good faith and fair dealing implied in the Act 304 Settlement[.]" Inasmuch as we have already analyzed and concluded that the claims in the first amended complaint were properly dismissed, we now examine the sole new claim alleged in the proposed second amended complaints to determine whether it could survive a motion to dismiss.

The plaintiffs' claim for breach of good faith and fair dealing is based on their belief that "the State's failure to oppose the FAA's position not only constitutes a breach of the Act 304 Settlement as a contract but also the covenant of good faith and fair dealing implied in the Act 304 Settlement[.]" In other words, the new claim is inextricably linked to the plaintiffs' allegation that Act 304 constituted a settlement agreement or contract. However, as previously discussed, neither the language nor circumstances surrounding Act 304's enactment evinces the clear and unambiguous legislative intent to contractually bind the State to Act 304's terms and, as such, it cannot be said that Act 304 constituted a settlement agreement. Inasmuch as the plaintiffs cannot establish that the State entered into a valid, enforceable, and binding settlement agreement with the plaintiffs, we conclude that the plaintiffs can prove no set

of facts entitling them to relief based on this new claim. Therefore, the proposed claim of breach of good faith and fair dealing, like the other claims in the second amended complaints, fails to state a claim upon which relief could be granted and would not have survived a motion to dismiss. Consequently, the proposed complaints are futile. Accordingly, we hold that the circuit court did not abuse its discretion in denying the plaintiffs' motion to amend.

## C. Whether the Circuit Court Abused its Discretion in Denying the Plaintiffs' Motion to Bifurcate

Inasmuch as the plaintiffs have failed to state any claims upon which any relief could be granted, there were no claims for the circuit court to bifurcate. As such, we hold that the circuit court did not abuse its discretion in denying the plaintiffs' motion to bifurcate. *See Masaki v. Gen. Motors Corp.,* 71 Haw. 1, 5 n. 1, 780 P.2d 566, 570 n. 1 (1989) (holding trial court did not abuse its discretion in denying appellants' motion to bifurcate where appellants failed to show prejudice, stating that "[t]he decision to hold separate trials on the issues of liability and damages is a matter within the sound discretion of the trial judge, and unless prejudice is shown, will not be reversed on appeal") (citations omitted).

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's May 19, 2004 final judgment in favor of the State. However, as in *OHA I,* given our disposition of these cases and the context of their complexity, "we would do a disservice to all parties involved if we did not acknowledge" the State's continuing trust obligations to native Hawaiians. 96 Hawai'i at 401, 31 P.3d at 914. We have repeatedly stated that the legislative branch is vested with the authority to determine *how* the State satisfies its constitutional trust obligations. However, we have also consistently recognized that the judiciary is vested with the responsibility to ensure that trustees, whether public or private, uphold their fiduciary duties. We acknowledge that, even though Act 304 was repealed, HRS § 10–13.5

continues to mandate that "[t]wenty per cent of *all funds* derived from the public land trust ... shall be expended by ... [OHA]." And, as Senator Inouye clarified during his floor statement to the United State Senate,

the removal of the Airport Revenue Fund for use by the State of Hawai'i as a source of compensating [OHA] for use of ceded lands upon which the airports sit, should not equate to a like reduction in the State's obligation to OHA under state law. . . .

*The airports continue to sit on ceded lands, the State's obligation to compensate OHA for the use of the land upon which the airports sit should also continue.* . . . [I]n light of the unique history of Hawai'i's ceded lands and the obligations that flow from these lands for the betterment of the Native Hawaiian people, I believe that *this is more than a fiscal matter, this is a fiduciary matter—one of trust and obligation*[.]

(Emphases added.) Therefore, as we also stated in *OHA I,*

it is incumbent upon the legislature to enact legislation that gives effect to the right of native Hawaiians to benefit from the ceded lands trust. *See* Haw. Const. art. XVI, § 7 ... [and] we trust that the legislature will re-examine the State's constitutional obligation to native Hawaiians and the purpose of HRS § 10–13.5 and enact legislation that most effectively and responsibly meets those obligations.

96 Hawai'i at 401, 31 P.3d at 914.

ACOBA, J., concurred in result only.